IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 5, 2022

**STATE OF TENNESSEE v. ROY THOMAS ROGERS, JR.**

**Appeal from the Circuit Court for Gibson County**
**No. H9449     Clayburn L. Peeples, Judge**

_____

**No. W2021-00807-CCA-R3-CD**

_____

A Gibson County jury convicted the Defendant, Roy Thomas Rogers, Jr., of initiating the manufacture of methamphetamine, promoting the manufacture of methamphetamine, possession of drug paraphernalia, and criminal impersonation. The trial court sentenced the Defendant to an effective sentence of twelve years. On appeal, the Defendant argues that: (1) the trial court improperly admitted evidence, (2) the evidence was insufficient to support his convictions, and (3) the trial court improperly sentenced him. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined. CAMILLE R. MCMULLEN, J., concurs in result only.

Jeff Mueller (on appeal) and Daniel Rogers and Tom Crider (at trial), Trenton, Tennessee, for the appellant, Roy Thomas Rogers, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Frederick Hardy Agee, District Attorney General; and Hilary Parham and Jason Scott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a search of the Defendant's residence following a "knock and talk." At the time of the search, the Defendant was living with his girlfriend, Dana Watt, in Ms. Watt's trailer ("Avondale trailer"). Ms. Watt provided consent to search. During the search, law enforcement found drug paraphernalia and the remnants of a

methamphetamine lab. Consequently, a Gibson County grand jury indicted[1] the Defendant for initiating the manufacture of methamphetamine, promoting the manufacture of methamphetamine, possession of drug paraphernalia, and criminal impersonation. Ms. Watt was also charged in relation to these offenses; however, her case was severed from the Defendant's before trial.

## A. Pretrial Motion Hearing

The Defendant filed a motion in limine asking the trial court to exclude evidence of a garbage bag and its content that law enforcement found outside the Avondale trailer. In the motion, the Defendant asserted that the prejudicial effect of this evidence substantially outweighed the probative value in violation of Tennessee Rule of Evidence 403. The trial court held a hearing on the matter. The sole witness at the hearing was Gibson County Sheriff[2] Paul Thomas. Sheriff Thomas received complaints about the Defendant's involvement in the manufacture of methamphetamine. Additionally, he received information from the Humboldt Police Department that the Defendant, as a sex offender, was not in compliance with the requirements of the Sex Offender Registry. Based upon this information Sheriff Thomas and Gibson County Sheriff's Office Chief Deputy[3] Danny Lewis searched the Avondale trailer and surrounding area. The search revealed a garbage bag with methamphetamine production materials.

Prior to finding the garbage bag, the law enforcement officers spoke with the Defendant and Ms. Watt. Ms. Watt told the officers that she had purchased pseudoephedrine and camp fuel for the Defendant. She denied ever seeing the Defendant cook methamphetamine but admitted to using methamphetamine that he provided. She stated that it was "common" for the Defendant to possess items used to manufacture methamphetamine. Ms. Watt said that the Defendant kept these items in a black garbage bag and would leave with the garbage bag through the back door of the Avondale trailer. She told the officers that sometimes the Defendant would be gone for a few minutes and

---

[1] To assist in the resolution of this proceeding, we take judicial notice of the appellate record from the Defendant's prior direct appeal, *State v. Roy Thomas Rogers*, No. W2015-00988-CCA-R3-CD, 2016 WL 1045352, at *1 (Tenn. Crim. App., at Nashville, Mar. 15, 2016). *See* Tenn. R. App. P. 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009); *State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

[2] At the time of the offenses, Paul Thomas was assigned to the West Tennessee Drug Task Force. At the time of his testimony at the hearing and the trial, he had become the Gibson County Sheriff. Consistent with the transcripts, we will refer to him by his title as Sheriff throughout the opinion.

[3] Chief Lewis was also assigned to the West Tennessee Drug Task Force at the time of the Defendant's offenses but thereafter, changed employment to the Sheriff's Office. We refer to him by his title in the Sheriff's Office throughout the opinion.

2

other times he would be gone for a longer period of time but that he would frequently return with methamphetamine that the couple used together.

After hearing this information, Sheriff Thomas exited the back door of the Avondale trailer and considered areas around the trailer that the Defendant could access quickly. Approximately fifty yards from the Avondale trailer, Sheriff Thomas saw a guardrail on the other side of the road that ran next to the trailer. He walked over to the guardrail and, on the other side of the guardrail, found the black garbage bag with the remnants of a methamphetamine lab inside. Sheriff Thomas "connected" the bag with the Defendant based upon Ms. Watt's statement that he would leave the Avondale trailer with a black garbage bag and be gone for short periods of time. Sheriff Thomas also found garbage bags of the same type, black with a gray drawstring, inside the Avondale trailer.

Law enforcement collected the items in the garbage bag and sent some of the items for testing, such as a gray substance. Testing revealed that the substance found in the garbage bag was 47.21 grams of methamphetamine. Other items in the bag and items found in the Avondale trailer were consistent with items used to manufacture methamphetamine. As part of the investigation, Sheriff Thomas consulted the "pill logs" and found that the Defendant had last purchased pseudoephedrine three days before the search.

After hearing this evidence, the trial court denied the Defendant's motion to suppress, finding that the evidence was not "too prejudicial."

## B. Trial

The parties presented the following evidence at trial: On January 22, 2013, Sheriff Thomas and Chief Lewis conducted a "knock and talk" at the Avondale trailer, a residence associated with the Defendant. Both officers testified for the State at trial, and the trial court declared the officers expert witnesses in the field of methamphetamine investigation.

At trial, Sheriff Thomas explained to the jury that a "knock and talk" was part of the investigative process. When law enforcement received "enough information" regarding a suspect's possible involvement with drugs but not sufficient information for an arrest warrant, officers often go to a suspect's residence, knock on the door, notify the suspect that they have received information that the individual may be involved with illegal drug activity, and ask for permission to search the residence.

In this case, Sheriff Thomas received information that the Defendant was involved in the manufacture of methamphetamine and conducted a "knock and talk" with his partner at the time, Chief Lewis. Sheriff Thomas knocked on the door of the Avondale trailer, and

3

the Defendant opened the door. The Defendant identified himself as "Tommy." Sheriff Thomas, however, had previously accessed the Defendant's driver's license photograph. Recognizing the Defendant from the photograph, Sheriff Thomas corrected the Defendant saying, "No, you're Roy." The Defendant walked backwards, saying, "No, he's in the back, I'll go get him," and then he turned and disappeared.

Chief Lewis, who had remained in the car, had known the Defendant since the Defendant was a teenager and recognized the Defendant when he answered the door. When the Defendant told Sheriff Thomas that "Roy" was "in the back," Chief Lewis suspected the Defendant was going to attempt to flee out the back door of the Avondale trailer. Chief Lewis exited the car and went to the back of the Avondale trailer. As he approached, he saw the Defendant exiting the back door of the trailer. He called out the Defendant's name, and the Defendant retreated back inside. Meanwhile, still at the front of the Avondale trailer, Sheriff Thomas assessed the situation as an "Officer safety issue" because the Defendant lied and then retreated. He opened the front door of the Avondale trailer and saw the Defendant at the back side of the trailer and heard Chief Lewis call out the Defendant's name from the rear of the trailer.

As Sheriff Thomas stood just inside the front door, Ms. Watt walked out into the "common area." Chief Lewis heard Sheriff Thomas inside the Avondale trailer speaking loudly to the Defendant, so he entered through the back door. Once inside, he saw Ms. Watt, the Defendant, and Sheriff Taylor standing in the common area. Chief Lewis advised Ms. Watt and the Defendant of their *Miranda* rights and explained why the officers were at the Avondale trailer. Although the Defendant's was listed on the utility bill for the Avondale trailer, he denied living in the trailer. Ms. Watt stated it was her "home" and gave consent to search the property. After Ms. Watt signed the consent to search form, Sheriff Thomas searched the property while Chief Lewis remained with the Defendant and Ms. Watt.

Sheriff Thomas first searched the master bedroom and found "snort straws," a plastic baggy with residue, "split lithium batteries," "stirring sticks," a box of aluminum foil, a bucket with a funnel and vice grips, and a whole lithium battery. Sheriff Thomas testified that, in his experience, all of these items were consistent with the manufacture of methamphetamine. He explained that lithium was necessary to the manufacturing process and explained how each of the above listed items were commonly used in the manufacturing process. In the bathroom, Sheriff Thomas found Coleman camp fuel, another solvent associated with the manufacture of methamphetamine, and sulfuric acid drain cleaner. Sheriff Thomas found no other items associated with the manufacture of methamphetamine inside the trailer.

At this point in the search, Sheriff Thomas had found only items associated with manufacture and use, but not the "meth lab." He walked out onto the back porch and saw a guardrail next to the road that ran beside the Avondale trailer. On the other side of the guardrail was a ditch. Because people who make methamphetamine often "dump" the methamphetamine lab items, Sheriff Thomas walked across the yard to the guardrail and looked into the ditch. There he saw a black garbage bag with a gray drawstring. Based upon his experience with methamphetamine labs, Sheriff Thomas was fairly certain of what he would find in the black garbage bag. He climbed down into the ditch and cut open the garbage bag. Inside he found an acid generator bottle, a one-pot shake bottle, and unused coffee filters. Sheriff Thomas stated that coffee filters are often used in the "straining process of methamphetamine." He also found used coffee filters with gray powder on them and a "Sam's Cola can." Sheriff Thomas found a box of black garbage bags with wide gray drawstrings in the Avondale trailer that were consistent in appearance with the garbage bag he found in the ditch.

Sheriff Thomas called Chief Lewis, who was still inside the trailer, outside. Chief Lewis walked across the street to the guardrail where he saw a garbage bag with gray drawstrings. Chief Lewis estimated that the area where the bag was found was about fifty yards from the back door of the Avondale trailer. Inside the garbage bag were materials - acid generator, shake bottle, coffee filters with gray powder on them, and regular coffee filters – used to manufacture methamphetamine. The gray powder collected from the plastic bag was sent to the Tennessee Crime Lab. Analysis of the substance indicated that it was 47.21 grams of methamphetamine. He also sent the "slider" found inside the Avondale trailer, however there was an insufficient sample on the slider for any substance to be detected. The slider was sent for testing because there was "paste still on it." Chief Lewis explained that a slider is a rectangular piece of aluminum foil used to ingest methamphetamine.

On cross-examination, Sheriff Thomas stated that he was not wearing a uniform at the time of the "knock and talk," but that his law enforcement badge was "prominently" displayed. He explained the process of a "shake and bake" lab as was alleged in this case as follows:

> You'll start with a coke bottle. Typically, have to have ammonia nitrate fertilizer. Which the most common method of getting ammonia nitrate fertilizer would be out of cold compress packs. You know, the packs that -- if you got a sprain, you squeeze them and the water pops inside of them, and they get real cold.
>
> If you were to cut one of those open, what's inside of it is ammonia nitrate and a little pouch of water. So that's the most common way of getting

the ammonia nitrate. You're going to have to have pseudoephedrine pills, more than likely crushed. They'll put them in a pill grinder or blender and turn it into powder, add that to the solution. You got to have a solvent, which will typically be Coleman camp fuel, will be added to the solution. Lithium metal from the batteries will be added to the solution. Probably at some point a small amount of water, just drops, literally drops of water will be added to it.

At some point in the reaction, you're going to have to make the -- you know, it's going to start becoming -- becoming too base and too neutral, and you're going to have to bring it back to neutral with some sulfuric acid. At some point in the reaction, you're going to end up with pure ephedrine in liquid form in that bottle. At that point you use the coffee filters, we'll pour the liquid through the coffee filters into something else to catch the liquid. The coffee filters would be used to catch all the trash that's remained in the bottle. Then you will use the sodium -- or the sulfuric acid, drain cleaner, and table salt for the final process to convert it from liquid to crystal.

. . . .

The shake process will all be done in one bottle. Then when you have to mix the sulfuric acid and the table salt for the final process to convert it from liquid to crystal will be done in a second bottle, which is what the generator bottle is, the acid generator that we found in the garbage bag.

Sheriff Thomas agreed that he did not find any "cold packs" or pseudoephedrine in the house. He confirmed that pseudoephedrine is essential to the process. Neither did he find table salt which is essential to the process. Sheriff Thomas agreed that the garbage bag found in the ditch and in the house were sold at Walmart in Humboldt and that many residents of Humboldt shopped there.

After hearing this evidence, the jury convicted the Defendant of initiating the manufacture of methamphetamine, promoting the manufacture of methamphetamine, possession of drug paraphernalia, and criminal impersonation.

### C. Sentencing Hearing

At the sentencing hearing, the State offered and the trial court entered the Presentence Report into the record. The State argued that the Defendant should be classified as a Range I offender as to the conviction for initiating the manufacture of

methamphetamine and a Range II offender as to the conviction for promoting the manufacture of methamphetamine. The State asked that the trial court sentence the Defendant to the maximum sentence within the range based upon his history of criminal activity. The State stated it did not believe any other enhancement factors were applicable.

The Defendant asked the trial court to consider mitigating factor (1), that the Defendant's conduct did not cause bodily injury; (3) substantial grounds, the Defendant's addiction, existed to excuse the Defendant's conduct; and (4) the Defendant played a minor role in the commission of the offenses. T.C.A. § 40-35-113(1), (3), and (4).

The trial court began by acknowledging the Defendant's extensive history of criminal offenses. The trial court listed the offenses and the sentences imposed. The trial court stated that the Defendant's record "richly justifies him receiving the maximum sentence" for the initiating the manufacture of methamphetamine conviction and ordered a twelve year sentence as a Range I offender. The trial court also sentenced the Defendant as a Range I offender for the promoting the manufacture of methamphetamine conviction, finding that the State had not proven the Defendant should be classified as a Range II offender for the conviction. He imposed a four-year sentence for the promoting the manufacture conviction, eleven months and twenty-nine days for the drug paraphernalia conviction, and six months for the criminal impersonation conviction. All of the sentences were to run concurrently for a total effective sentence of twelve years. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant argues that: (1) the trial court improperly admitted evidence, (2) the evidence was insufficient to support his conviction, and (3) the trial court's sentence was excessive.

### A. Admission of Garbage Bag and its Contents

The Defendant asserts that the trial court erred in admitting the black garbage bag and its contents found in the ditch across the street from the Avondale trailer. He argues that the probative value was substantially outweighed by the danger of unfair prejudice. The State responds that the trial court properly exercised its discretion in admitting evidence. We agree with the State.

The admission of evidence is left to "the sound discretion of the trial judge," *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992), and "[r]elevancy is always a judicial question to be determined according to the issue which is to be tried." *Randolph v. State*, 570 S.W.2d 869, 872 (Tenn. Crim. App. 1978) (quoting *Ellison v. State*,

549 S.W.2d 691, 696 (Tenn. Crim. App. 1976)). We review a trial court's admission of evidence under an abuse of discretion standard and will reverse the decision to admit evidence only if "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court first determine whether the proffered evidence is relevant. Under Rule 401, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 4.01[4], at 4-8 (4th ed. 2000).

After a court finds that the proffered evidence is relevant, then the court will weigh the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. If the court, in its discretionary authority, finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Clearly, Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. *See Roy v. Diamond*, 16 S.W.3d 783, 791 (Tenn. Ct. App. 1999). "Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *White v. Vanderbilt Univ*., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999).

The trial court properly denied the Defendant's request to exclude the contents of the garbage bag because the evidence was relevant to the charges against the Defendant, and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The remnants of a methamphetamine lab and the 47.21 grams of methamphetamine in the black garbage bag were relevant to whether the Defendant was involved in the manufacture of methamphetamine.

The Defendant's chief complaint appears to be that the State failed to "establish a sufficient nexus between [him] and the garbage bag." At the motion in limine hearing, Sheriff Thomas testified that he had received complaints about the Defendant's involvement in manufacturing methamphetamine. Sheriff Thomas went to the residence where the Defendant was named on the utilities and where he was present at the time. Ms. Watt made statements leading Sheriff Thomas to the rear of the trailer where Ms. Watt said

8

the Defendant would sometimes exit the back door with a black garbage bag and return with methamphetamine. Sheriff Thomas considered, from the back door of the Avondale trailer, areas the Defendant could quickly access. Fifty yards from where he stood, directly across the street from the Avondale trailer, was a culvert. Inside the culvert was the black garbage bag with gray drawstring ties containing the remnants of a methamphetamine lab. The black garbage bags with the gray drawstrings were consistent with garbage bags found in the Avondale trailer. Additionally, law enforcement found items consistent with methamphetamine use in the master bedroom of the trailer.

The Defendant contends that the evidence related to the garbage bag only served to "inflame the jury against him." We disagree. The State charged and, therefore, had to prove that the Defendant was engaged in the manufacture of methamphetamine. There was sufficient evidence to connect the Defendant to the garbage bag and its contents were relevant to the issues at trial. The evidence was prejudicial; however, not so prejudicial as to outweigh the probative value.

Accordingly, we conclude that the trial court did not abuse its discretion in allowing the State to admit evidence relevant to the drug charges for which the Defendant was being tried. The Defendant is not entitled to relief as to this issue.

### B. Sufficiency of the Evidence

The Defendant asserts that the evidence is not sufficient to support his convictions for initiation of the manufacture of methamphetamine, promoting the manufacture of methamphetamine, possession of drug paraphernalia, or criminal impersonation. The State asks us to affirm the Defendant's convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn.

2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

### 1. Initiation of the Manufacture of Methamphetamine

Tennessee Code Annotated section 39-17-435(a) provides that "[i]t is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." The term "initiates" is defined as "to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active

10

modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." T.C.A. § 39-17-435(c) (2018). "Expert testimony of a qualified law enforcement officer shall be admissible for the proposition that a particular process can be used to manufacture methamphetamine." T.C.A. §39-17-435(d) (2018).

Viewed in the light most favorable to the State, the evidence in the present case establishes that the Defendant was involved in initiating the manufacture of methamphetamine. Although, the Defendant denied ownership of the residence, he provided the Avondale trailer's address upon booking after his arrest and his name was on the utility bill. Ms. Watt consented to the search of the Avondale trailer, and in the master bedroom and bathroom Sheriff Thomas found "snort straws," a plastic baggy with residue, "split lithium batteries," "stirring sticks," a box of aluminum foil, a bucket with a funnel and vice grips, a whole lithium battery, Coleman camp fuel, and sulfuric acid drain cleaner. Sheriff Thomas testified as to how each of these chemicals or tools could be used in the manufacture of methamphetamine. A short distance from the residence, Sheriff Thomas found a black garbage bag filled with the remnants of a methamphetamine lab and 47.21 grams methamphetamine. Sheriff Thomas testified that it was common for methamphetamine manufacturers to "dump" the remnants of the lab. The black garbage bag with gray drawstrings was consistent with garbage bags found inside the trailer. This evidence is sufficient to support the Defendant's conviction.

Accordingly, we conclude that a rational juror could have found, beyond a reasonable doubt, that the Defendant initiated a process intended to result in the manufacture of methamphetamine. The Defendant is not entitled to relief as to this issue.

### 2. Promoting the Manufacture of Methamphetamine

An individual is guilty of promoting methamphetamine manufacture if he or she "[s]ells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use[.]" Tenn. Code Ann. § 39-17-433(a)(1) (2018). "'Manufacture' means the production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis[.]" T.C.A. § 39-17-402 (2018).

The evidence, viewed in the light most favorable to the State, showed that the Defendant possessed lithium batteries, a funnel, vice grips, Coleman camp fuel, and sulfuric acid drain cleaner inside his residence. Sheriff Thomas offered expert testimony that camp fuel and sulfuric acid are used to manufacture methamphetamine and that the

11

lithium batteries, funnel, and vice grips are used in the process of manufacturing methamphetamine. The combination of chemicals, apparatus, and paraphernalia for use provides sufficient evidence that the Defendant obtained these items for the purpose of manufacturing methamphetamine.

Accordingly, we conclude that a rational juror could find that the Defendant possessed the items found during the search knowing the items would be used to manufacture methamphetamine. The Defendant is not entitled to relief as to this issue.

### 3. Possession of Drug Paraphernalia

In order to convict the Defendant of possession of drug paraphernalia, a Class A misdemeanor, the State was required to show that the Defendant used or possessed with the intent to use, drug paraphernalia to inject, ingest, inhale or otherwise introduce into the human body a controlled substance. T.C.A. §39-17-425(a)(1) (2018).

The Defendant does not contest that the items found in the master bedroom of the Avondale trailer were drug paraphernalia. Instead he argues that the State failed to prove that those items belonged to him. He asserts that there was no evidence that he was anything more than a visitor to the trailer. We disagree. The officers went to the Avondale address to find the Defendant after receiving complaints about his involvement in the manufacture of methamphetamine. The Defendant, although he tried to mislead Sheriff Thomas, was present at the address. When he was booked into jail following his arrest, he provided the Avondale address as his address consistent with the fact that the utilities for the trailer were in his name. Based upon this evidence, a jury could reasonably infer that the Defendant had access to the drugs and paraphernalia in the bedroom and bathroom of the Avondale trailer where he lived. Furthermore, as the State notes, the jury could consider the Defendant's attempt to flee when law enforcement officers arrived, as evidence of consciousness of guilt. *See State v. Rimmer*, 623 S.W.3d 235, 264 (Tenn. 2021).

Accordingly, we conclude that there was sufficient evidence upon which a jury could find, beyond a reasonable doubt, that the Defendant possessed snort straws, aluminum foil, and a "slider" to use methamphetamine. The Defendant is not entitled to relief as to this issue.

### 4. Criminal Impersonation

As relevant here, a person commits the offense of criminal impersonation when the person assumes a false identity with the intent to defraud another person. T.C.A. § 39-16-301(a)(1) (2018). The Defendant presented himself as "Tommy" to Sheriff Thomas when

Sheriff Thomas addressed the Defendant by the name "Roy." Sheriff Thomas corrected the Defendant saying "No, you're Roy." The Defendant again denied he was Roy, saying that "Roy" was in the back and that the Defendant would go get "him." The Defendant then attempted to flee out the back of the Avondale trailer. Even were we to assume that the Defendant was confused by the officer referring to the Defendant by the name of "Roy" rather than the Defendant's middle name, we note that the only other person in the trailer at that time was Ms. Watt. The Defendant lied to the officer when he said he would go "get [Roy]."

Based on the foregoing, we conclude that the evidence was sufficient to support Defendant's conviction for criminal impersonation. *See State v. Brooks*, 909 S.W.2d 854, 859 (Tenn. Crim. App. 1995) (concluding that to establish the offense of criminal impersonation, the State need show only that the accused intended to misrepresent his true identity to the arresting officer).

## C. Sentencing

The Defendant argues that the trial court improperly used the Presentence Investigation Report as evidence of his criminal history and that the trial court failed to consider enhancement and mitigating factors in determining his sentences.

### 1. Presentence Report

The Defendant asserts that the trial court erred by relying on the presentence report as evidence of his criminal history. He contends that the trial court should have required the State to introduce certified copies of his convictions or required the investigating officer who wrote the report to testify. The State responds that the law is well-settled that the trial court may rely on a presentence report for sentencing.

The Sentencing Act allows for the admission of "reliable hearsay." T.C.A. § 40-35-209(b). A presentence report constitutes reliable hearsay. *State v. Baker*, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997). In order to admit the presentence report as reliable hearsay, two conditions must be met. *State v. Taylor*, 744 S.W.2d 919, 921 (Tenn. Crim. App. 1987). First, the party opposing the evidence must receive a fair opportunity to rebut any hearsay admitted into evidence. *Id.*; T.C.A. § 40-35-209(b). Second, "indicia of reliability must be present to satisfy the due process requirement." *Taylor*, 744 S.W.2d at 921 (citations omitted); see T.C.A. § 40-35-209(b); *see also State v. Fusco*, 404 S.W.3d 504, 534 (Tenn. Crim. App. 2012) (quoting *State v. Danny Anderson*, 1986 WL 9307, at *3, (Tenn. Crim. App., at Jackson, August 27, 1986)) ("'[P]rior convictions need not be certified when they are otherwise reliable and the defendant has been given the opportunity to rebut the evidence.'"). The trial court is entitled to rely on the presentence report "absent

13

a showing that the report is based upon unreliable sources or is otherwise inaccurate." *State v. Richard J. Crossman*, No. 01C01-9311-CR-00394, 1994 WL 548712, at *6 (Tenn. Crim. App. Oct. 6, 1994).

We conclude that the trial court properly considered the presentence report in considering the Defendant's criminal history. The State filed a notice of enhancement prior to trial, and the felony convictions in the presentence report were also listed in the State's notice, making the Defendant aware of the felony convictions upon which the State intended to rely. The Defendant was afforded the opportunity at the sentencing hearing to rebut the convictions included in the presentence report through his own testimony or by introducing the testimony of the investigating officer who prepared the report. He chose not to do so. The investigating officer who prepared the presentence report signed the report underneath the phrase "unless otherwise noted, the information contained herein has been verified and is accurate to the best of this officer's knowledge," giving the report indicia of reliability. The Defendant is not entitled to relief as to this issue.

## 2. Enhancement and Mitigating Factors

The Defendant argues that the trial court erred in sentencing him because it failed to consider enhancement and mitigating factors and failed to make findings as to which factors it found applicable. The State responds that the trial court properly considered enhancement and mitigating factors in determining a within-range sentence that is consistent with the purposes and principles of the Sentencing Act. We agree with the State.

On appeal, a defendant bears the burden of establishing that his sentence is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record

demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2019).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2019); *see also Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

The State filed a notice of intent to seek an enhanced sentence, and at the sentencing hearing argued that the Defendant's lengthy criminal record was a significant factor for the trial court's consideration. The Defendant submitted that three mitigating factors were applicable. The trial court expressly found that the Defendant's prior convictions "richly justifie[d] him receiving the maximum sentence." The trial court then sentenced the Defendant to concurrent sentences of twelve years for his initiating the manufacture of methamphetamine conviction, four years for his promoting the manufacture of methamphetamine conviction, eleven months and twenty-nine days for his possession of drug paraphernalia conviction, and six months for his criminal impersonation conviction.

15

The record reflects that the trial court considered the evidence, the nature of the criminal conduct involved, the presentence report, and the purposes and principles of sentencing prior to imposing within-range sentences of confinement. The Defendant's sentence is justly deserved in relation to his offenses. Therefore, the Defendant has failed to establish that the trial court abused its discretion in imposing his sentences and he is not entitled to relief.

### III. Conclusion

Based upon the foregoing, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE